IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DANIEL ROBERTS, AS NEXT FRIEND § <br> AND THE EXECUTOR OF THE § <br> ESTATE OF MARGARET ROBERTS § <br>     Plaintiff, § <br> § <br> v. § <br> § <br> CITY OF HOUSTON, TEXAS, § <br>     Defendant. § | <br><br><br><br>CIVIL ACTION NO. 4:18-CV-1818 |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff Daniel Roberts As Next Friend and the Executor of the Estate of Margaret Roberts, deceased ("Roberts"), files this Original Complaint against Defendant City of Houston, Texas, and in support, respectfully shows the Court as follows:

**I.
INTRODUCTION**

1.     This action seeks economic damages, compensatory damages, liquidated damages, attorney's fees, expert witness fees, taxable costs of court, pre-judgment and post-judgment interest for race discrimination and gender discrimination in violation of Title VII, suffered by Roberts in the course of her employment with Defendant. Plaintiff will show that Roberts was discriminated against regarding the terms and conditions of her employment based on her race and her gender and retaliated against after she opposed unlawful discrimination in the workplace.

## II.
## PARTIES

2. Plaintiff Daniel Roberts is a Texas resident. He brings this Original Complaint as Next Friend and the Executor of the Estate of Margaret Roberts, deceased.

3. Defendant City of Houston, Texas is a governmental entity. Service of the Summons and this Complaint may be made by serving Anna Russell, its City Secretary, at 900 Bagby Street, Houston, Texas 77002 under the authority of Texas Civil Practice & Remedies Code § 17.024(b).

4. Whenever in this Complaint it is alleged that Defendant committed any act or omission, it is meant that the Defendant's officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification, or approval of Defendant or was done in the routine normal course and scope of employment of the Defendant's officers, directors, vice-principals, agents, servants, or employees.

## III.
## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. 1331.

6. This Court has personal jurisdiction over City of Houston, Texas and venue is proper in Harris County, Texas because all or a substantial part of the events or omissions giving rise to Robert's claims occurred in Harris County, Texas, and at all times relevant to this causes of action against City of Houston, Texas, accrued, Roberts worked for City of Houston, Texas in Harris County, Texas.

## IV.
## CONDITIONS PRECEDENT TO SUIT

7. All conditions precedent to filing this cause of action have been met.

8. Roberts filed a complaint of discrimination against Defendant under Charge Number 460-2008-00528 with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission Civil Rights Division ("TWC-CRD") on or about November 1, 2007.

9. On or about September 16, 2009, Roberts filed an Amended Charge of Discrimination.

10. On or about April 15, 2011, Roberts filed a Second Amended Charge of Discrimination.

11. On or after March 6, 2018, the United States Department of Justice issued a Notice of Right to Sue letter entitling Roberts to file an action in this Court for her claims.

12. This action is filed within ninety (90) days of Robert's receipt of the Notice of Right to Sue Letter from the Department of Justice.

## V.
## FACTUAL BACKGROUND

13. Roberts is a female, Black, African-American, firefighter previously employed by Defendant.

14. Roberts was employed by Defendant as a firefighter in the Houston Fire Department ("HFD").

15. At all times during her employment, Roberts was qualified for the position she held with Defendant.

16. The City of Houston, Texas Fire Department has engaged in a pattern and practice of targeting Black / African American firefighters and subjecting those firefighters to harassment and a hostile work environment.

17. The black firefighters are also subject to the HFD policies discriminatorily.

18. The City of Houston, Texas Fire Department has engaged in a pattern and practice of targeting female firefighters and subjecting those firefighters to harassment and a hostile work environment.

19. The female firefighters are also subject to the HFD policies discriminatorily.

20. Roberts attended the Houston Fire Academy and completed her training in 1994 and Roberts joined the Houston Fire Department ("HFD").

21. Roberts had applied for Air Rescue Fire Fighting ("ARFF") for seven years and never even received a phone call or even a letter or denial.

22. Roberts applied for ARFF because few others wanted to go to ARFF because they had Assistant Chief Danny Smith, Senior Captain Tamez Captain Cooper and Captain Tamez.

23. Other firefighters referred to them as henchmen. They were sent to ARFF because they had failed two FAA inspections and FAA was considering civilianizing the airport.

24. The old head ARFF guys and Union constantly would fight with the new ARFF staff.

25. The old heads at Station 54 started threatening Captain Cooper (black male), Assistant Chief Danny Smith (black male), and Captain Shulin (white male).

26. They would put sugar in their gas tanks, leave dirty letters on ARFF vehicle (one person was caught on camera, fired, and then allowed to retire).

27. Senior Captain Shulin's office at Station 54 was papered with letters on his wall and vulgar language was written on the walls, and feces were placed in his desk drawer.

28. A lot of ARFF firefighters were transferred out of ARFF, and Roberts was able to put in for ARFF and get it.

29. While in training for ARFF, Ken Harvey pulled another male's pants down in front of Roberts, and Nefertari Pendleton (Alexander).

30. Both turned away, but nothing was said or done.

31. This incident occurred in front of an entire class of male firefighters.

32. Roberts worked at Station 54 for a very short period of time. During her stay at 54, she got pregnant and was transferred to the Houston Fire Department's administrative building in downtown Houston.

33. Roberts asked if there were any ARFF assistant positions so she would not have to be transferred downtown, but she was informed that staff positions were only for captain positions and above.

34. After Roberts had her baby on November 21, 2003, she was transferred back to Station 99.

35. In or around 2006 or 2007, Captain Tamez treated Roberts differently compared to her coworkers.

36. Captain Tamez would pull Roberts close to him and try to hug her.

37. On each occasion, Roberts would pull back because it was not wanted and unwelcome.

38. Captain Tamez came from Station 81 and where many of his male subordinates complained about him because of his relationship with a female employee.

5

39. Captain Curry witnessed Captain Tamez's behavior and said it offended him that he hugged Roberts.

40. Captain Tamez asked Roberts if she knew a particular African-American model and he would frequently comment on how "hot" she was.

41. A Senior Captain, Chief Bennett, once exposed his penis to a female firefighter by the name of Sharon Branch while she was washing her hands in the restroom.

42. Ms. Branch filed a grievance against the Senior Captain.

43. The Senior Captain was eventually promoted to the position of Chief, and refused to apologize.

44. In March or April 2007, Tamez called Roberts into his office to counsel her about absenteeism.

45. Tamez accused Roberts of having too many riders.

46. However, Firefighters were all provided a certain amount of riders per year and Roberts had not exceeded the allowed number of riders nor has she had as many riders as other firefighters.

47. Tamez told Roberts she could transfer downtown and put her on an 8-5 shift as opposed to work the nine day a month schedule she currently worked.

48. Roberts believed this was a threat.

49. On May 15, 2007 Shawn Gourley told Roberts that he was ordered by Captain Tamez to train her on AR-18 (ARFF Apparatus).

50. Carol Mayfiled was present when Gourley said Tamez told him to take a few other firefighters out so it would not look as if he was singling Roberts out.

51. On July 16, 2007 Captain Tamez came to Station 99 to do an inspection of the apparatus.

52. At that time, Captain Tamez told Roberts to get the K-12 saw off the AR-17.

53. Tamez asked if Roberts had checked the saw out and asked whether she had checked the oil and fuel, all of which Roberts had done.

54. Tamez ordered Roberts to start the K-12 saw which she did.

55. No other firefighters were asked to start the K-12 saw.

56. On August 3, 2007, Roberts asked Curry for a wellness day on August 9.

57. Curry asked Tamez if Roberts could have a Wellness Day off.

58. Tamez stated that she would only get eight hours off.

59. Roberts felt discriminated against because Andy Burkhaulter was allowed to have a 12-hour Wellness day on July 26, 2007.

60. On August 11, 2007, Plaintiff inquired whether she could have a rider, but her request was refused by Captain Tamez.

61. Tamez instructed Captain Curry to call Tamez to obtain approval for any rider for Roberts.

62. On August 17 and 19, 2007, Ronnie Dees was allowed a rider for both of his 24-hour shifts.

63. On August 17, 2007 Roberts met with Captain Curry and told him that she believed she was being discriminated against due to her race/color and/or gender.

64. Curry and Roberts then went to Senior Captain Don Hoyt.

65. Roberts explained to Hoyt that Tamez was harassing and discriminating against her and singled her out to do things not required of male firefighters.

66. Curry told Hoyt that he witnessed these incidents.

67. Hoyt then asked Roberts to leave so he could talk to Curry.

68. Curry later told Roberts Hoyt called Tamez over and informed him of Robert's complaint.

69. Curry told Tamez that he was told captains should stick together.

70. On August 19, 2007 Captain Curry during roll call stated that Tamez came over and wanted to know what could be done to resolve the conflict.

71. Curry told Tamez to stay at his station and let him run his station.

72. Curry said that Tamez agreed to leave them alone.

73. Tamez also asked Curry whether Roberts was going to file a complaint against him.

74. Assistant Chief Berry transferred Roberts back to Station 54 after Roberts filed a grievance.

75. The women's dorm at Station 54 smelled like urine because the male firefighters would often urinate in the sinks and on the floors of the women's dorm.

76. Roberts complained to Captain Tamez and as a result, management had someone steam-clean the carpet.

77. The wife of one of the firefighters submitted a written complaint about the condition of the women's dorm restroom at Station 54.

78. The complaint was sent to OIG for investigation.

79. After this incident, management forbade male firefighters from going into the women's dorm and Station 99 did not have these problems; just Station 54.

80. After Roberts won the grievance, Chief McAteer found out Roberts had been transferred back to Station 99.

81. Chief McAteer threw a temper-tantrum yelling, "What the hell is going on around here?" He also stated that Station 99 was going to start a little more training, etc.

82. On one occasion while working at Station 99, Roberts made a run and accidently left her cell phone at the station.

83. When Roberts returned, she discovered that someone had taken a picture of his penis with her cell phone.

84. One of Robert's coworkers told her that Kenneth Harvey was the one who had taken the picture.

85. Roberts recalled an incident in which Harvey pulled Danny Martinez' pants down such that Martinez was fully exposed.

86. Harvey worked at Station 99 on the C shift.

87. Warren Hooker and Jimmy Hunter told Roberts that Harvey asked him if she still had that picture of a penis on her phone.

88. A firefighter by the name of Mayfield retired and left a vacancy at Station 99.

89. Roberts was already at Station 99; however, the Chief posted the vacancy after telling everyone he was taking the posting off because there was no opening.

90. Roberts later found out that District Chief George McAteer, did not take the posting off and then two days later Roberts was transferred to Station 54.

91. A male firefighter got the position at Station 99.

92. On October 22, 2007 Roberts was sent to fill-in at Station 54.

9

93. Tamez told Roberts she was going to be made a permanent fill-in and she was going to be transferred to 54.

94. An official posting on October 24, 2007 was placed that stated that Roberts transferred from Station 99 to Station 54 to balance the work force.

95. Male and female firefighters sleep in separate dorms at Stations 99 and 54.

96. Captain Tamez pulled Roberts in his office with Mark Webster and Roberts informed Captain Tamez that she was not comfortable being in a room with him.

97. Tamez told Roberts, "oh well sometimes we are not away comfortable with things."

98. Roberts kept reiterating that she was not comfortable and he kept saying that sometimes we are not comfortable with things and continued making his comments.

99. He stated they were going to make Roberts the permanent fill-in until they transferred her permanently.

100. On October 29, 2007, Roberts and Anthony Thomas went to Alvin White, Grievance Coordinator, and filed a grievance.

101. Roberts won the grievance and transferred back immediately from Station 54 to Station 99.

102. Whenever Roberts called in sick to work, management retaliated by denying her overtime.

103. In contrast, male firefighters who called in sick to work were given the opportunity to work overtime.

104. Whenever a firefighter declines management's request to work overtime, that firefighter's name is then put at the bottom of the overtime list, depending on the reason for declining the request.

105. In May 2008, OIG notified Roberts that they had completed the investigation of her latest grievance and that they had found evidence to support her grievance.

106. OIG said they had to send it to legal and it stayed in legal from May to August of 2008.

107. Roberts then received a letter stating complaint was not sustained.

108. A week and a half later, Roberts' FMLA request was denied, even though her FMLA had been approved for at least five years for the same issue.

109. In effect, in August of 2008, the Houston Fire Department denied Roberts FMLA.

110. In addition, the Houston Fire Department disclosed information about her medical condition to Assistant Chief Hector Trevino, Assistant Chief William Barry, Senior Captain Tamez and other managers in the letter denying my FMLA.

111. During Robert's tenure at HFD, she has been denied equal opportunities and treatment, and been subjected to a hostile work environment and retaliation.

112. Defendant has discriminated against Roberts by denying or restricting her ability to have riders fill-in for her on days she was assigned based on her race/color and/or gender.

113. Defendant has discriminated against Roberts by threatening to reassign her downtown and/or transferring to another Station and/or keeping her as a permanent fill-in employee based on her race/color and/or gender and/or in retaliation against after she opposed unlawful discrimination in the workplace.

114. Defendant has discriminated against Roberts by subjecting her to a Hostile Work Environment based on her race/color and/or gender.

115. Defendant has discriminated against Roberts by imposing additional qualifications, requirements or testing and/or denying promotions or overtime opportunities based on her race/color and/or gender and retaliated against after she opposed unlawful discrimination in the workplace.

116. Defendant has discriminated against Roberts by imposing limitations on the use of her Wellness days based on her race/color and/or gender and retaliated against after she opposed unlawful discrimination in the workplace.

117. Defendant has engaged in a pattern and practice of targeting female firefighters and Black / African American firefighters and subjecting these firefighters to discrimination, harassment, retaliation, and a hostile work environment.

118. The actions directed towards Roberts other female firefighters were demeaning, humiliating, hostile, aggressive, unprofessional, and constituted sexual harassment that was severe, egregious, pervasive and altered the terms and conditions of Roberts' employment.

119. The actions directed towards Roberts and other Black / African-American firefighters were demeaning, humiliating, hostile, aggressive, unprofessional, and constituted sexual harassment that was severe, egregious, pervasive and altered the terms and conditions of Roberts' employment.

120. The discriminatory, retaliatory and/or hostile work environment events occurred continuously from 1994 until Roberts passed.

121. Roberts was targeted for harassment, a hostile work environment, and discrimination because of her gender and her race / color.

122. During Roberts' employment with the City, Roberts was subjected to disparate treatment regarding compensation, including overtime, opportunities to "ride up", transfers and assignments because of her gender, female, and her race/color, black/African-American.

123. These conditions have resulted in segregation between the various fire stations and shifts, and have led to violations of Title VII and the Equal Pay Act, 29 U.S.C. § 206(d).

124. In addition, Defendant's policies and practices regarding transfers, overtime assignments, promotions and additional compensation opportunities have a negative disparate impact on African Americans and women in violation of Title VII.

125. Roberts has been discriminated against, subjected to different terms and conditions of employment, lower compensation, and to harassment and retaliation because of her gender and race, in violation of Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000e, *et seq.*, and the Texas Commission on Human Rights Act, as codified in the Texas Labor Code § 21.001, *et. seq.*

## VI.
## CAUSE OF ACTION—
## GENDER DISCRIMINATION/HOSTILE WORK ENVIRONMENT
## IN VIOLATION OF TITLE VII

126. Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

127. As described above, during her employment, Roberts was subjected to discrimination and a hostile work environment based on her gender, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*

128. Roberts was subjected to disparate treatment regarding compensation, including overtime, transfers, promotional opportunities, and assignments because of her gender.

129. Those conditions described above resulted in segregation between the various fire stations and shifts, and led to violations of Title VII and the Equal Pay Act, 29 U.S.C. § 206(d).

130. Defendant did not make a good faith effort to comply with statutes against discrimination.

131. Defendant knowingly, willfully, or with reckless disregard, carried out its illegal pattern or practice regarding discrimination towards Roberts.

132. Roberts have not been afforded the same terms and conditions of their employment as similarly situated employees outside Robert's protected category.

133. Defendant allowed, failed to take any action, failed to take remedial action, failed to discipline its employees, and/or failed to take any corrective action, thereby allowing and facilitating the continuance of the discrimination and harassment towards Roberts.

134. The conditions described above led to a hostile work environment because of the following conditions:

    a. Severe and/or pervasive;

    b. Outrageous conduct;

    c. Demeaning conduct;

    d. Failure to take prompt remedial action;

    e. Affected terms and conditions of Plaintiffs' employment;

    f. Did not provide sufficient recourse.

135. Further, Defendant acted with malice or, in the alternative, with reckless indifference to the federally protected rights of the Roberts.

136. As a result of Defendant's actions or inaction in violation of Title VII, Roberts has suffered loss of wages and benefits, in the past, as well as emotional pain, mental anguish,

suffering, inconvenience, and loss of enjoyment of life in the past, all of which were caused by Defendant's treatment of Roberts.

## VII.
## CAUSE OF ACTION—
## RACE/COLOR DISCRIMINATION/HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

137. Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

138. As described above, during her employment, Roberts was subjected to discrimination and a hostile work environment based on her race/color, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*

139. Roberts was subjected to disparate treatment regarding compensation, including overtime, transfers, promotional opportunities, and assignments because of her race and color.

140. Those conditions described above resulted in segregation between the various fire stations and shifts, and led to violations of Title VII.

141. Defendant did not make a good faith effort to comply with statutes against discrimination.

142. Defendant knowingly, willfully, or with reckless disregard, carried out its illegal pattern or practice regarding discrimination towards Roberts.

143. Roberts have not been afforded the same terms and conditions of their employment as similarly situated employees outside Robert's protected category.

144. Defendant allowed, failed to take any action, failed to take remedial action, failed to discipline its employees, and/or failed to take any corrective action, thereby allowing and facilitating the continuance of the discrimination and harassment towards Roberts.

145. The conditions described above led to a hostile work environment because of the following conditions:

    a. Severe and/or pervasive;

    b. Outrageous conduct;

    c. Demeaning conduct;

    d. Failure to take prompt remedial action;

    e. Affected terms and conditions of Plaintiffs' employment;

    f. Did not provide sufficient recourse.

146. Further, Defendant acted with malice or, in the alternative, with reckless indifference to the federally protected rights of the Roberts.

147. As a result of Defendant's actions or inaction in violation of Title VII, Roberts has suffered loss of wages and benefits, in the past, as well as emotional pain, mental anguish, suffering, inconvenience, and loss of enjoyment of life in the past, all of which were caused by Defendant's treatment of Roberts.

## VIII.
## CAUSE OF ACTION—
## RETALIATION

148. Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

149. During her employment, Roberts opposed unlawful discrimination in the workplace.

150. As described above, because Roberts opposed unlawful race and/or gender discrimination in the workplace, Defendant retaliated against Roberts and subjected her to different terms and conditions of employment.

151. As a result of Defendant's actions in violation of Title VII described above, Roberts has suffered loss of wages and benefits, in the past, as well as emotional pain, mental anguish, suffering, inconvenience, and loss of enjoyment of life in the past, all of which were caused by Defendant's treatment of Roberts.

## IX.
## ATTORNEYS' FEES

152. Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

153. As a result of the actions stated above, Plaintiffs were forced to employ the undersigned attorneys.

154. As a result of Defendant's conduct, Plaintiffs are entitled to recover from Defendant their reasonable attorneys' fees for bringing this action pursuant to the applicable statutes, as well as the costs incurred in this action and any and all appeals of this action.

## X.
## DAMAGES

155. Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

156. As a result of Defendant's violations of Title VII. Plaintiff seeks the following relief: (1) loss of wages, compensation, and benefits in the past; (2) costs of court, expert fees and attorneys' fees; (3) mental anguish and emotional distress in the past and future (4) any punitive, equitable or liquidated damages provided by law, and (5) pre-judgment and post-judgment interest as allowed by all relevant statutes.

## XI.
## JURY DEMAND

157. Plaintiff requests a trial by jury on all issues triable by a jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that judgment be entered against the Defendant for (a) Robert's actual damages; (b) Robert's pecuniary damages and losses; (c) attorneys' fees and costs; (d) pre-judgment and post-judgment interest at the highest allowable legal rate; (e) mental anguish damages; and (f) all such other and further relief, both at law and in equity, to which Plaintiff may be justly entitled.

                Respectfully submitted,

                AHMAD, ZAVITSANOS, ANAIPAKOS,
                    ALAVI & MENSING P.C.

By:   /s/ Joseph Y. Ahmad
       Joseph Y. Ahmad
       Texas Bar No. 00941100
       joeahmad@azalaw.com
       1221 McKinney Street, Suite 2500
       Houston, Texas 77010
       Telephone: (713) 655-1101
       Telecopier: (713) 655-0062

Of Counsel:

AHMAD & CAPODICE, PLLC

Nasim Ahmad
State Bar No. 24014186
nahmad@cline-ahmad.com
Dwain Capodice
State Bar No. 24031915
dwaincapodice@gmail.com
24900 Pitkin, Suite 300
The Woodlands, Texas 77386
Telephone: (832) 767-3207
Facsimile: (281) 864-4379

                ATTORNEYS FOR PLAINTIFF
                DANIEL ROBERTS AS NEXT FRIEND AND
                THE EXECUTOR OF THE ESTATE
                OF MARGARET ROBERTS